UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:05CV-204-R

LEROY A. KENDRICK                                                    PLAINTIFF

v.

CHRISTIAN COUNTY FISCAL COURT, ET AL.                    DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion for Partial Summary Judgment (Docket # 13).  Plaintiff filed a response (Docket #15) to which Defendants have replied (Docket #18).  This matter is now ripe for adjudication.  For the reasons that follow, Defendants' Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

The Plaintiff, Leroy A. Kendrick, is a former deputy jailer who was terminated from his employment at the Christian County Jail ("Jail") on October 5, 2004.  Plaintiff was hired by the Jail in August of 1998.  The given reason for Plaintiff's termination was his alleged use of excessive force involving an inmate at the Jail.  Plaintiff claims that this termination for excessive force was pretextual in nature and that his termination was instead based on his race.  Plaintiff also claims that he was subjected to a racially hostile environment, that his due process rights were violated, that the Defendants conspired to discriminate against him on the basis of race, that the Defendants retaliated against him for making complaints of racial hostility and disparate treatment, and that he was subjected to the intentional infliction of emotional distress.

The incident for which Plaintiff was reportedly terminated occurred on September 6, 2004,

and involved an inmate named Earl Parker.  Parker was a TransCor inmate at the Jail.  TransCor inmates are individuals who are being extradited across state lines from one prison to another. Plaintiff indicated that TransCor inmates are treated differently at the Jail because, although it is known that they are all convicted felons, the Jail and the deputies are often unaware of the crimes of these TransCor inmates or of their behavior.

Parker came to the Jail on September 6, 2004.  Deputy Deluga was called to booking when Parker refused to sign his medical intake papers.  When informed that he needed to sign the documents, Parker replied that he "wasn't signing shit."  Deluga then placed Parker in an isolation cell, where he was when the Plaintiff encountered him later in the day.

Plaintiff, Deputy Steve Futrell, and Jail Trustee Christ Woods were serving dinner trays to the isolation cells when Parker asked the Plaintiff why he was in isolation and complained that he did not have a mat in his cell.  Plaintiff told Parker that he was in isolation for disciplinary reasons. Parker then began to swear at the Plaintiff, demanding a mat and arguing about why he was in isolation.  Plaintiff asked Parker not to cuss at him anymore and told Parker to calm down and back away from his cell door.

Woods then attempted to hand Parker his dinner tray.  Parker snatched the tray out of Woods' hand, slammed it down on the floor, and lunged at Plaintiff.  Plaintiff sprayed Parker with pepper spray and Parker then grabbed Plaintiff.  Plaintiff pushed Parker into his cell in an attempt to keep Parker out of the hallway.  Parker pushed Plaintiff onto the metal bench in his cell while Plaintiff tried to fight him off.  Although Woods alerted Futrell to the struggle, Futrell did not call backup or pull Parker off Plaintiff, despite Plaintiff's requests that he do so.  Futrell did grab one of Parker's arms while Parker was clawing at Plaintiff's eyes.  Plaintiff hit Parker with the can of

2

pepper spray in an attempt to free himself.  While Plaintiff was trying to get out from under Parker, Parker grabbed the can of pepper spray from Plaintiff and attempted to spray Plaintiff.  Plaintiff retrieved the can of pepper spray and put Parker in a shoulder pin.

Plaintiff asked Futrell for handcuffs and told him to call for backup, which he did.  Deputies Wes Campbell and Michael Grise responded to the call.  Campbell and Grise assisted Plaintiff in getting Parker restrained and handcuffed.  Parker was placed in a restraint chair and taken to be decontaminated from the pepper spray.

Plaintiff went to the office where Sergeant Mandy Howard was working.  Plaintiff was out of breath, bleeding, sweating badly, and had a ripped uniform.  Mandy Howard accused Plaintiff of being too aggressive with Parker.  Plaintiff wrote out an incident report and signed it along with Grise, Campbell, and Sergeants Bryan Thomas and Mandy Howard.  Futrell did not sign the incident report.  Parker did not file a complaint about the use of force employed by Plaintiff and did not seek or receive any medical treatment following the incident.

Following the incident, Plaintiff telephoned Jailer Livy Leavel to inform him of the situation with Parker.  Leavell responded that as long as Plaintiff was telling the truth, he did not see that there was a problem with the incident.  Futrell's failure to sign the incident report was brought to the attention of Leavell by his Chief Deputy, Brad Boyd, who had initiated an investigation regarding the incident.  Futrell later provided a brief incident report of his own in which he expressed his opinion that Plaintiff had used excessive force on September 6, 2004.  A month later, Futrell expanded on this initial statement indicating that he did not witness Parker being aggressive or offensive and that Parker did not attempt to strike Plaintiff or take his can of pepper spray.

Pursuant to the investigation regarding Plaintiff's use of force, the individuals who had

initially signed off on Plaintiff's incident report were asked to write detailed, individual statements as to what had occurred.  Grise testified that at no time when he was present at the scene on September 6, 2004, did Plaintiff use excessive force and that Plaintiff did not throw Parker into the restraint chair.  Campbell authored a statement consistent with Plaintiff's incident report and later testified that Parker was "absolutely" a threat to Plaintiff and others at the scene.  Leavell subsequently terminated Plaintiff for use of excessive force and falsifying documents.

Prior to September 6, 2004, nobody employed with the Jail had ever been disciplined or terminated for the use of excessive force.  Plaintiff indicates that when he was employed with the Jail he was made aware of an unwritten policy that  when an inmate put his hands on a deputy or got out of line, the deputy was to "monkey-stomp his ass and send him to the ER."  A former deputy testified that he once heard Leavell tell Plaintiff to "knock an inmate the fuck out if they get out of line, you were a boxer, and you guys know how I want my jail ran."  Several other former deputies testified to this unwritten policy.  Plaintiff also points to incidents with other deputies, one which involved a deputy beating an inmate over the head with a flashlight after the inmate scratched the deputy and one which involved a deputy breaking an inmate's arm, where the deputies were not terminated or subject to any disciplinary action.  Several deputies testified that there was a practice of omitting or covering up any use of excessive force from incident reports.  Deputy Sal Cuellar testified that the normal policy at the Jail when an incident with an inmate occurred was to write an incident report and then take it to Captain John Hendry, the Jail's expert on use of force, who would in turn tell the deputy how to rewrite the report or would have someone else rewrite the report so that the Jail could avoid trouble.

Plaintiff points to the behavior of his fellow employees to further demonstrate his claim of

disparate treatment.  Plaintiff indicates that Mandy Howard and Steve Howard would often move the clocks forward at the Jail in order to make Plaintiff appear late for work.  Also, on one occasion Mandy Howard wrote Plaintiff up for being one minute late for work.  Subsequently, Deputies Buckner, Thomas, and Owen told Debbie Maldonaldo that Plaintiff was not late and that something needed to be done about Mandy Howard writing up Plaintiff when he was not late.  When Maldonaldo discussed the situation with Mandy Howard, Howard said that she was going to continue writing Plaintiff up.  Plaintiff also alleges that he was constantly being called to deal with the hostile inmates, even when other deputies had already volunteered to go.  There is also evidence that  Jail employees used racial jokes and they were often made during every shift.  Although these remarks were not made to his face or within his hearing, Plaintiff was called a "nigger" and a drug dealer by several of the Jail employees.  Plaintiff was also accused of messing around with the female inmates by these employees.  One employee told Plaintiff that he planned to burn a cross in his front yard.  Plaintiff brought these incidences to the attention of Jailer Leavel and to Major Boyd. Plaintiff indicated that once he spoke to Leavell, the comments concerning him messing around with the female inmates ceased.  However, Plaintiff indicates that when he brought the cross-burning comments made by Deputy Johnsey to his superiors' attention, no disciplinary action was taken. Plaintiff also indicates that when he brought the drug dealer comments to his superiors' attention he was told that the other employees were just joking and no disciplinary action was taken.

Plaintiff indicates that he was not informed of his right to a grievance procedure by Leavell or anyone else at the Jail.

Following Plaintiff's termination, he filed a complaint with the Equal Employment Opportunity Commission (EEOC).  The EEOC conducted an investigation and made a determination

that there was reasonable cause to believe that a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Title VII), had occurred.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc.*

*v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

### I.   PLAINTIFF'S CLAIMS AGAINST "THE JAIL"

In his complaint, Plaintiff named the Christian County Fiscal Court, doing business as the Christian County Jail as a Defendant.  In the complaint Plaintiff makes references to this Defendant as "the Jail."  Plaintiff indicates that this was for the purpose of convenience only.

Therefore, this Court will regard all claims against "the Jail" as claims against Christian County Fiscal Court.

### II.   OFFICIAL CAPACITY CLAIMS

Plaintiff has asserted claims against Defendants Livy Leavel, Mandy Howard, Bruce Glover, Bryan Thomas, Steve Futrell, and Steve Howard, in their individual and official capacities as Christian County Jailers.  The United States Supreme Court, in a case arising from the Sixth Circuit, has held that a "suit against a state official in his or her official capacity is not a suit against the official, but rather a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989).  As such, a suit against a government agent in their official capacity equates to a suit against the government agency in question.

### III.   42 U.S.C. § 1981

In order to assert a successful claim of discrimination under 42 U.S.C. § 1981, the  plaintiff must demonstrate that the defendant engaged in purposeful or intentional discrimination. *Leonard v. Frankfort Elec. & Water Plant Bd.*, 752 F.2d 189, 193 (6th Cir. 1985).  "This intent requirement may  be  satisfied  by  direct  allegations  and  proof  of  invidious  discriminatory  animus  or

7

circumstantially demonstrated by alleging and proving discriminatory conduct, practices, or the existence of significant racially disproportionate impact." *Id.* Under the circumstantial evidence approach, Plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000). If the Plaintiff is able to do so, a mandatory presumption of discrimination is created and the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 573 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). The Plaintiff may establish that the proffered reason was a mere pretext by showing that (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; and (3) the stated reasons were insufficient to explain the Defendant's action. *Id.*

Defendants, citing *Monell v. Department of Social Services,* 436 U.S. 658 (1978), assert that Plaintiff has failed to state a cause of action for discrimination as he has not shown an officially executed policy causing the violation of the constitutional right. However, as demonstrated above, Plaintiff was not required to show an officially executed policy in order to state a cause of action for discrimination. *See Johnson*, 215 F.3d at 572-73.

Therefore, this Court finds that Defendants are not entitled to summary judgment on Plaintiff's discrimination claim.

## IV.   RACIALLY HOSTILE ENVIRONMENT

Plaintiff claims that during the course of his employment, the Jail, by and through its agents

8

and employees, discriminated against him in the terms, conditions, and privileges of his employment in substantial part because of his race, in violation of Title VII and KRS 344 et seq. As KRS 344 mirrors Title VII, this Court will use the federal standards for evaluating the claims under both Title VII and KRS 344. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000).

Plaintiff's claims against Mandy Howard, Glover, Thomas, Futrell, and Steve Howard under Title VII cannot go forward because such claims can only proceed against individuals who qualify as employers, which Plaintiff does not allege. *Johnson*, 215 F.3d at 571.

Title VII makes unlawful an employer's decision "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1) (1994). In order to establish a racially hostile work environment, a plaintiff must show that "the conduct in question was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and that the victim subjectively regarded it as abusive." *Smith*, 220 F.3d at 760. Additionally, the Plaintiff must prove that his employer "tolerated or condoned the situation, or knew or should have known of the alleged conduct and did nothing to correct the situation."[1] *Id.* (internal quotations omitted).

In determining whether an environment is one that a reasonable person would find hostile or abusive and whether the Plaintiff perceived it to be so, courts look at all of the circumstances, including: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[1] Defendants do not address the employer's knowledge of the alleged conduct or actions taken by the employer in correcting any such conduct in their motion for summary judgment.

with an employee's work performance." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).  A recurring point in Supreme Court opinions is that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not satisfy the requirements.  *Id.* at 512-13 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The hostile environment must be "commonplace, ongoing, or continuing." *Smith v. Leggett Wire Co.*, 220 F.3d at 760 (c*iting Burnett*, 203 F.3d at 984-85).  Plaintiff is not required to show that the alleged instances of harassment were related in either time or type.  *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988).

Defendants claim that Plaintiff never subjectively perceived the work environment to be hostile or abusive.  Defendants also assert that there was no evidence that any alleged wrongful conduct was "severe or pervasive."   Finally, Defendants maintain that there was insufficient evidence that the alleged harassment had the effect of unreasonably interfering with Plaintiff's work.

Plaintiff admits that no one associated with the Jail called him a "nigger" to his face.  However, Plaintiff arguably knew of these comments as he testified that he reported them to his supervisor.  A fellow deputy told Plaintiff, while at work, that he was going to burn a cross in Plaintiff's yard.  Plaintiff testified that this same deputy was always cracking jokes and making racial remarks. The cross-burning remark was reported to a supervisor at the Jail and no disciplinary action was taken.  Plaintiff also claims that he was called a drug dealer by his fellow employees and that these same employees accused him of messing around with female inmates.  The comments about Plaintiff and the female inmates stopped once Plaintiff brought them to his supervisor's attention in Fall of 1999.  Although Plaintiff reported the drug dealer comments, no disciplinary action was taken.  Plaintiff also asserts that he was constantly called to deal with the inmates who were hostile, a difficult task, even when other deputies volunteered to deal with them.  Plaintiff also

10

claims that two of his fellow deputies would set the clock at the jail forward so that Plaintiff would appear late to work.  Plaintiff testified that he was written up as late on account of this although he was actually on time.

This Court does not find that the threat of burning a cross in Plaintiff's yard or fellow employees' references to Plaintiff as a "nigger" were simple teasing or offhand comments.  *Cf. Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the word "nigger" is pure anathema to African-Americans.  Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates."  (citation and internal quotation marks omitted)).

Defendants cite *Smith v. Leggett Wire Co.* as support for their proposition that Plaintiff did not establish an objectively hostile work environment.  In *Smith*, the Court found that a racial slur by a fellow employee, a racially offensive and obscene cartoon passed around the workplace, a racist joke told by an employee, and a supervisor's reference to a black employee as a "gorilla" were not severe or pervasive enough to create an objectively hostile work environment when the incidences occurred over the span of twenty years.  *Smith*, 220 F.3d at 760.

In the present case, unlike in *Smith*, the allegedly wrongful conduct occurred over a period of six rather than twenty years.  The present case also involves a greater number of allegedly wrongful acts than those in *Smith*.  Plaintiff alleges that a fellow employee was always telling racial jokes, that he was called a drug dealer by fellow employees, and that other employees were moving clocks forward to make Plaintiff appear late for work.  Plaintiff asserts that no action was taken when he reported these actions to his supervisors.  Therefore, this Court finds that there is a material

11

issues of fact regarding whether Plaintiff has established an objectively hostile work environment.

In establishing the requisite adverse effect on work performance, the Plaintiff does not need to show that his tangible productivity declined as a result of the harassment, he need only show that the harassment made it more difficult to do the job. *Davis*, 858 F.2d at 349. Here Plaintiff testified that when Defendant changed the workplace clock, which he asserted was done out of racial animus, it resulted in him being written up as late. Arguably this hindered his ability to do his job as he was written up for his lateness. Plaintiff also asserts that as a result of racial animus he was consistently called to deal with the more difficult inmates unlike other employees. Thus, this Court finds that there are material issues of fact regarding the adverse effect on work performance.

Therefore, this Court finds that Plaintiff may proceed on his claim of a racially hostile work environment.

## V.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/OUTRAGE

To make out a claim for intentional infliction of emotional distress, or outrage, the plaintiff must show that: (1) defendants' conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it offends against generally accepted standards of decency and morality; (3) a causal connection between defendants' conduct and the emotional distress; and (4) the emotional distress is severe. *Gilbert v. Barkes*, 987 S.W.2d 772, 777 (Ky. 1999). An action for intentional infliction of emotional distress will not lie for "petty insults, unkind words and minor indignities; the action only lies for conduct which is truly outrageous and intolerable." *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. App. 2001). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him

12

to exclaim, 'Outrageous!'" *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004) (quoting RESTATEMENT (SECOND) OF TORTS § 46(1) cmt. d (1965)).

Defendants claim that the comments referred to by Plaintiff are offensive and inexcusable but cannot be regarded as "utterly intolerable in a civilized community." However, this Court finds fellow deputies calling Plaintiff "nigger" and a fellow deputy's statement to Plaintiff during work hours that he was going to burn a cross in Plaintiff's yard is the type of conduct that would arouse the average member of the community's resentment against the actor and lead him to exclaim "Outrageous!" *See id; Spriggs*, 242 F.3d at 185 ("Far more than a mere offensive utterance, teh word "nigger" is pure anathema to African-Americans.").

Although Plaintiff has shown that at least some of the complained of conduct was intolerable and outrageous, Plaintiff has failed to show that he suffered severe emotional distress. *See Burgess v. Taylor,* 44 S.W.3d 806, 812 (Ky. Ct. App. 2001) (stating that severe emotional distress consisted of panic attacks, depression uncured by medication or therapy, and thoughts of suicide requiring medical care after knowing that plaintiff's "babies were dead"). His unsupported assertion that he suffered emotional distress does not meet the standard required to survive a motion for summary judgment. *See Hartsel,* 87 F.3d at 799.

Therefore, this Court finds that Plaintiff's action for intentional infliction of emotional distress fails as a matter of law.

## VI.   RIGHT TO DUE PROCESS

Plaintiff complains that he was not informed of or provided with a copy of the Christian County Administrative Code relating to the grievance procedure available to him following the decision to terminate his employment and that the Jail's failure to notify him of this procedure

13

violated his due process rights as outlined in Section 2 of the Kentucky Constitution.

Page two of § III-300 of the Jail's policy and procedure manual contains the following provision:

> 3.<u>Grievances</u>: Employees of the Christian County Jail shall have access to the established grievance procedures of Christian County.

Section 5.54 of the Code provides that the employee's grievance may be presented by the employee to the Judge Executive for review by the grievance committee within a reasonable period of time.

Testimony indicated that the Jail's policy and procedure manual was given to employees to take home at the time they were hired.  However, contradictory testimony indicated that the Jail's policy and procedure manual is not provided to employees but is gone over with the employees at the time of hire.  Plaintiff indicates that he was never informed of or provided with the Jail's policy and procedure manual.  Uncontroverted testimony reveals that a copy of the Jail's policy and procedure manual is located in the booking room for the employees' review.

Applicable Kentucky Administrative Regulations require that a written policy and procedures manual be made available to jail employees.  501 KAR 3:020.  However, the Regulations do not indicate the method in which the manual must be made available.  This Court finds that providing a copy of the manual in the booking room available for employee review comports with the requirements of the Kentucky Administrative Regulations and the Jail's policy and procedure manual.

Plaintiff also claims that his termination violated KRS 71.060, which provides that Jailers may only discharge their deputies for cause.  As Defendants admit, if Plaintiff prevails on his federal claim of wrongful termination then he would necessarily prevail on his claim that the termination violated KRS 71.060.

14

Therefore, this Court finds that the Jail made a copy of their policy and procedures manual, which contained the grievance procedure, available to Plaintiff and thereby comported with due process requirements.

**VII.   RETALIATION**

42 U.S.C. § 2000e-3(a) prohibits an employer from retaliating against an employee who has opposed any practice by the employer made unlawful under Title VII.  To establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to Defendants; (3) Defendants thereafter took adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Hafford*, 183 F.3d at 515.  Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII, including complaining to anyone . . . about allegedly unlawful practices. *Johnson*, 215 F.3d at 579.

Here, Plaintiff claims that he, along with numerous other Jail employees, had a valid belief that the Jail's treatment and "punishment" of Plaintiff violated Title VII as it was racially motivated. Defendants assert that there is no evidence of any activity Plaintiff engaged in that warranted retaliation and that there is no evidence of a causal connection between any protected activity and his termination.

It is unclear if what Plaintiff means by "punishment" is his termination from employment. Plaintiff may not assert a retaliation claim for any action that occurred post-termination, as Plaintiff must demonstrate that the adverse employment action was taken by the Defendants after Plaintiff engaged in activity protected by Title VII.  *See Hafford*, 183 F.3d at 515 .

15

Although Defendants assert that Plaintiff did not engage in any activity protected by Title VII, the Defendants have not alleged that Plaintiff did not engage in activity which *he believed* was protected by Title VII. *See Johnson*, 215 F.3d at 579. As Defendants failed to address this issue, there remains material issues of fact regarding this element.

Defendants cite *Hafford v. Seidner* to support their proposition that Plaintiff has failed to show a causal connection between any protected activity and the adverse employment action. In *Hafford* the Plaintiff was disciplined five and ten months after filing OCRC and EEOC charges. *Hafford*, 183 F.3d at 515. Four disciplinary actions were taken in the year after he filed the second of these charges. Seven disciplinary actions were taken over a seven month period the following year. *Id.* The Court found that "because the disciplinary actions occurred two to five months after [Plaintiff] filed charges, and are fairly evenly spread over a period of time, the inference of causal connection based on temporal proximity alone is tenuous. Absent additional evidence, this loose temporal proximity is insufficient to create a triable issue." *Id.* (internal quotations omitted).

Plaintiff asserts that he was terminated several days after informing an employee that moving the clocks was illegal. Plaintiff asserts that the employee was moving the clock so that Plaintiff would appear late out of racial animus. The proximity in time between this action and Plaintiff's termination is much greater than that in *Hafford*. Also *Hafford* stated that "[a]bsent additional evidence" the loose temporal proximity was insufficient to show causation. In the present case, Plaintiff has presented evidence that a fellow deputy said that he couldn't stand the Plaintiff and that he was sent to Plaintiff's shift in order to get rid of him. Plaintiff also presented evidence that a supervisor stated that he did not like the Plaintiff and that he planned to try to get rid of him. Plaintiff asserts these comments resulted from racial animus. Thus, this Court finds that *Hafford* is

distinguishable from this case as Plaintiff has presented other evidence in addition to temporal proximity to demonstrate causation. Therefore, this Court finds that there are material issues of fact regarding the element of causation precluding summary judgment.

Therefore, this Court finds that Plaintiff may proceed on his claim for retaliation.

## VIII.  CONSPIRACY

Plaintiff's claim of conspiracy arises from the incident involving Parker on September 6, 2004. Plaintiff claims that Defendants changed the incident report and circulated alternative theories of the incidents. Plaintiff asserts that many if not all of the individually named Defendants were known to possess racial animus. Plaintiff claims that his termination for excessive force was pretextual.

The Sixth Circuit has held that in order to establish a claim for conspiracy under civil rights statute 42 U.S.C. § 1985(3), the plaintiff must prove: (1) conspiracy involving two or more persons; (2) a deprivation, directly or indirectly, affecting a person or class of persons entitled to equal protection of the laws; (3) an act in furtherance of conspiracy; and (4) that such act causes injury to person or property, or deprivation of any right or privilege of a citizen of the United States. *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). "Plaintiff must also establish that the conspiracy was motivated by a class-based animus." *Id.*

Defendants claim that Plaintiff has failed to show that two or more persons acted together to effectuate Plaintiff's termination. Defendants also assert that Plaintiff must show that any activity creating the conspiracy must take place outside the course of employment and that Plaintiff's failure to demonstrate this requires summary judgment in favor of the Defendants on this claim.

Defendants cite *Johnson v. Hills & Dales General Hospital* for the proposition that Plaintiff

17

must show that any activity creating a conspiracy took place outside the course of employment. However, *Johnson* limits its holding to claims against employees in a corporation.  As the Jail is not a corporation, Plaintiff need not show that activity creating a conspiracy occurred outside the course of employment.  *Id.* at 838.

Although Defendants assert that Plaintiff cannot prove that two or more people conspired together to effectuate Plaintiff's termination, they point to no evidence supporting this assertion. Plaintiff claims that Defendants conspired to change the incident report of the events with Parker and to circulate alternative theories of the incident.  This Court finds that there are material facts in dispute, which preclude summary judgment.

Therefore, this Court finds that Plaintiff may proceed on his claim of conspiracy.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

An appropriate order shall issue.

18